LOUISE OBERTELLI, respondent,

*v.*

I. HAROLD FREEMAN, appellant.

[Argued February 6th, 1948.  Decided May 13th, 1948.]

On appeal from a decree of the Court of Chancery, in which court Vice-Chancellor Bigelow filed the following opinion on July 7th, 1947.

"Victor Moruzzi, late of Newark, died intestate February 28th, 1941, leaving as his only heirs and next of kin four nephews and a niece named Passera, who live in the Province of Piacenza, Italy.  On September 22d, they executed a power of attorney to complainant, who is their cousin, to collect their inheritance for them.  A month or two later, she learned that they had done so and retained the defendant, I. Harold Freeman, as her proctor.  On October 24th, 1946, out of the

funds of the next of kin, she paid Freeman $4,407.95 for his alleged services. Later, becoming satisfied that he was not entitled to any such sum, she instituted this suit in behalf of her principals, to compel him to return the money, or all except a reasonable fee.

"From the exhibits I cull the following figures:

| | | |
|---|---:|---:|
| Gross personal estate, liquidated | | $17,296.23 |
| Funeral bill | $1,796.00 | |
| Inheritance tax | 1,001.30 | |
| Debts, bond premiums, administrator's commission, fees of surrogate, appraisers, translater, stenographer, postage, &c. | 1,373.77 | |
| | | 4,171.07 |
| Balance | | $13,125.16 |
| Marco Obertelli, administrator | $225.00 | |
| Thomas J. O'Mara, undertaker | 150.00 | |
| Jacob S. Glickenhaus, attorney, per stipulation and order December 1, 1941 | 100.00 | |
| Alien Property Custodian for attorney | 276.00 | |
| Robert Dranow, proctor for administrator | 2,485.00 | |
| J. H. Freeman, attorney | 4,882.95 | |
| | | $8,118.95 |
| Balance for next of kin | | $5,006.21 |

"Decedent also left a small parcel of real estate which has not yet been sold and which figures but little in the case.

"Marco Obertelli, a cousin of deceased, was appointed administrator March 26th, 1941, upon a petition showing that he and other cousins, resident in New York, were the next of kin. Freeman got wind of the fact that Moruzzi had died with no near relatives and proceeded to try to profit from the situation. On June 7th, he procured written retainers from three of the cousins, including Mrs. Louise Obertelli, who agreed to pay him 5% of whatever she might receive. Freeman also sought, but failed to get, from the administrator, appointment as his proctor. Both Marco, the administrator, and Mrs. Obertelli were aware that deceased had had a sister, Mrs. Passera, who had not immigrated to this country, and whom they thought had been survived by children. Marco ascertained that this was the fact and obtained the

names of the Passeras, or four of them, by August 4th, 1941. Mrs. Obertelli a little later received from Italy the names and addresses of all five Passeras. Under the direction of Freeman, Mrs. Obertelli wrote for a power of attorney. A broad power was executed in Italy September 22d, and sent on its way to this country, but was intercepted by the censor and did not reach its destination until early in 1946. However, on October 3d, the Passera brothers wrote Louise that they had executed the power in her favor. This letter was received in November and thereupon Mrs. Obertelli engaged Freeman to look after their interest in the estate.

"January 14th, 1942, Robert Dranow, who was the administrator's lawyer, wrote Freeman that he had heard rumors that deceased had real estate in Monmouth County. Freeman thereupon drew a petition and prepared an order dated April 10th, 1942, allowing the administrator $150 to investigate. Half of this amount, $75, was paid Freeman and he in turn paid $25 to a searcher, Webb, who made the investigation by examining the records of deeds in Monmouth and Ocean Counties, and found nothing. The $50 which Freeman received and retained, was ample pay in this connection.

"September 16th, 1942, Freeman filed an affidavit by Mrs. Obertelli which he had drawn and which bears date November 14th, 1941, naming the five Passeras as next of kin. This was his first service in their behalf. In November, the administrator filed his account which was noticed for settlement January 19th, 1943, and was approved that day, and $1,200 allowed to Dranow as a fee. Freeman testifies that he appeared in the matter and unavailingly objected to the counsel fee.

"On the morning of February 8th, 1943, Mrs. Obertelli, at a conference with Freeman, made an affidavit in which she stated that she had agreed to pay him a fee 'equal to 37½% of whatever amounts he recovered from them either by way of suit, settlement or compromise.' But Freeman was not content, and that same afternoon he procured from her an additional affidavit, 'At the time of the entering into of the said agreement with the attorney aforesaid, it was believed that the matter of litigation would be not involved nor com-

plicated by reason of the outbreak of war between the United States and Italy. Since that time, she realizes that the said attorney has rendered far more services than was contemplated and she is agreeable because of said fact, that the said I. Harold Freeman be compensated an additional 12½% of the amount of recovery for the aforesaid persons from the aforesaid estate.' The agreement to pay a fee of 50% out of the money of the Passeras may be contrasted with the agreement that Mrs. Obertelli had made in June, 1941, to pay 5%, when she hoped to get some of the estate for herself. It is easy to be generous with the property of others. Complainant says, and Freeman denies, that she agreed to 50% on Freeman's promise to turn over half the money to her, and that she intended to send that half to Italy.

"July 23d, 1943, the administrator filed a petition which resulted in an order October 26th, 1944, for payment of the estate into the Orphans Court and allowing an additional fee of $375 to Dranow. In compliance with this order, the administrator paid in $10,091.91. Freeman appears to have had no part in this proceeding.

"There the matter rested until February 14th, 1946, when Mrs. Obertelli wrote Freeman. They had an interview and on June 18th he filed on her behalf a petition that the fund be paid over to her as attorney for the next of kin. An order to show cause was made returnable August 13th. On July 18th, Mrs. Obertelli wrote Freeman that she had a letter from the Passeras saying that they had been notified by the police department of the amount of money they were supposed to receive. Without waiting for the return of the order to show cause, Freeman drew an application to the Federal Reserve Bank for first, a license to withdraw a counsel fee of $4,407.95, and second, a license to remit the balance of the fund to Italy at the rate of $500 a month. The counsel fee license was duly issued but Freeman was advised by the bank that no other special license was needed, as the situation was covered by General License 32A. The order for the withdrawal of the money from the Orphans Court was made October 8th and amended October 22d. It allowed Dranow a fee of $500 and required the balance to be deposited in the

Fidelity Union Trust Company in five separate blocked accounts. Two days later, the surrogate issued to complainant his check for $9,414.16, and she paid to Freeman from that amount $4,407.95, leaving $5,006.21 to her account as attorney for the five Passeras. A few days later, Freeman gave back to Louise $500. She has not redeposited it to the credit of the persons whom she represents.

"The decedent's real estate was an undivided one-third part of property known as 133 Fairmount Avenue, Newark. One James McCurry owns the other two-thirds and has been collecting the rents and paying the expenses. He submitted a statement to the administrator showing a net loss to December 31st, 1942, of which $300.64 was alleged to be due him from the Moruzzi heirs. In the fall of 1946, Freeman got in touch with McCurry and obtained a supplemental statement which I do not find among the exhibits. That completes the story of defendant's services for the Passeras.

"According to complainant, her agreement to pay Freeman 37½% as well as the supplemental agreement for an additional 12½%, were both made the day she swore to the affidavits February 8th, 1943. Freeman says the first agreement was made in the fall of 1941 before Italy declared war on our country. In either event, Freeman had been acting for some time as attorney for Mrs. Obertelli. There was a confidential relation between them. He knew, of course, when she promised to pay him out of the Passeras' money that she was acting as trustee and should not be generous to Freeman before being just to her *cestuis*. The size and character of the estate had already been ascertained. Freeman was aware that Dranow, as proctor for Marco, the administrator, would handle all legal matters involved in the settlement of the estate; he knew that Marco recognized that the Passeras were the next of kin, and that no contest was likely. Difficulty of communications would doubtless hinder obtaining definite proof from Italy that the five Passeras were the persons entitled and so delay a settlement. Foreign exchange regulations would prevent transmission of the money to Italy for a while. Such were the only difficulties to be anticipated. These factors did not make a contingent fee of 37½% reason-

·able. The second affidavit providing for the additional 12½% states as a reason therefor that 'the said attorney has rendered far more services than was contemplated.' He had, in fact, rendered almost no services. I have no difficulty in deciding that these two agreements were a shocking imposition on complainant, were constructively fraudulent and must be set aside.

"The jurisdiction of Chancery in this suit is based upon fraud leading to the cancellation of the agreement to pay a fee of 50%, and a restoration of the fund to complainant. There is an established principle that when equity takes hold, it will adjudicate the entire controversy and not make business for some other court. But in New Jersey this principle has not the broad scope it has elsewhere. Freeman demands the judgment of a law court on the reasonable value of his services for the Passeras. His preference will be granted. Let there be a decree that the agreements be canceled, defendant restrained from relying on them; that he repay to complainant $3,907.95 with costs of this suit; that complainant redeposit in the five Fidelity Union Trust Company accounts the sum of $500 which defendant has already repaid her, as well as whatever she recovers in this cause; that she refrain from withdrawing any money from the accounts, without special leave of the court, except to transmit the same to Italy; but she shall not so withdraw or transmit any part of the $500 or the money recovered from defendant. Defendant may have a reasonable time to establish the sum due."

And, on September 25th, 1947, the following opinion:

"In my memorandum dated July 7th, 1947, I said that Mr. Freeman could have a reasonable time to establish at law the sum due him for services to the Passeras under retainer of their agents. Since then he, as well as the complainant, has asked me to fix his fee and I will do so, following the established principle that when equity takes hold, it will adjudicate the entire controversy and not make business for some other court.

"Freeman has submitted, under oath, an itemized statement of services. Much of this work was done for Freeman's own benefit, or for Mrs. Obertelli personally, and not as agent

for the Passeras; and some of the work has already been paid for. Such items cannot be included in the fee now to be fixed; they are:

"Services rendered before receipt of the Passeras' letter of October 3d, 1941, informing Mrs. Obertelli that they had executed a power of attorney in her favor.

"Proceedings on the petition to remove the administrator.

"Ascertaining that deceased owned no shore property.

"Services relating to Social Security Board.

"Services mentioned on page 12, &c., for Freeman's own benefit in his attempt to get one-half of the net estate.

"There remain the following for which Freeman should have resonable compensation:

"November, 1941, drawing affidavit naming the five Passeras as next of kin and filing same September 16th, 1942.

"November, 1942, to January, 1943, examining administrator's account, conferences, appearance on settlement, and arguing objections to counsel fee.

"November, 1943, phone call relative to foreign fund control.

"March, 1946, conferences in New York relative to foreign fund control.

"June, 1946, to October, 1946, proceeding to obtain fund for Mrs. Obertelli, including drawing petition, court attendances, application for license, calls on bank, &c.

"October, 1946, phone call to McCurry's attorney.

"In reaching the value of these services, we consider a number of factors. The fund involved turned out to be $10,091.91, the sum paid to Mrs. Obertelli, although in the fall of 1941, there was a prospect that it might be somewhat larger. Freeman had had little experience as a lawyer in such matters, although, as an accountant, he had done some estate work. He had been recently admitted to the bar as an attorney and is not yet a counsellor. The work he did for the Passeras was not difficult and called for no display of special ability. On the other hand, there was the possibility that the Passeras, or Mrs. Obertelli, as their agent, would receive no part of the estate in which event Freeman would get nothing. But this possibility was not at all likely to hap-

pen. In fixing the fee, I have considered, besides Freeman's written statement, his testimony at the hearing and the exhibits, especially his own file and the Orphans Court record.

"Reasonable compensation for services on the administrator's account is $250; on the proceeding for the turnover of the fund to Mrs. Obertelli, $450; for other minor items, $50, making $750 in all. Freeman should also be repaid $20 advanced to the interpreter, but none of his other disbursements."

*Messrs. Milton M. & Adrian M. Unger (Mr. Milton M. Unger),* for the appellant.

*Mr. Andrew F. Zazzali,* for the respondent.

PER CURIAM.

The decree appealed from will be affirmed, for the reasons stated in the opinions filed in the court below by Vice-Chancellor Bigelow.

*For affirmance*—THE CHIEF-JUSTICE, BODINE, DONGES, HEHER, WACHENFELD, EASTWOOD, BURLING, WELLS, DILL, FREUND, McLEAN, SCHETTINO, JJ. 12.

*For reversal*—None.